# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
1411 K Street, NW, Suite 1300
Washington, D.C.  20005

      Plaintiff,

  v.

DAVID BERNHARDT, *in his official
capacity as Secretary of the United States
Department of the Interior*,
1849 C Street NW
Washington, D.C.  20240,

AURELIA SKIPWITH, *in her official
capacity as the Director of the United States
Fish and Wildlife Service*,
1849 C Street NW
Washington, D.C.  20240,

MARGARET EVERSON, *in her official
capacity as Director of the National Park
Service*,
1849 C Street NW
Washington, D.C.  20240,

UNITED STATES FISH AND WILDLIFE
SERVICE,
1849 C Street NW
Washington, D.C.  20240

*and*

NATIONAL PARK SERVICE,
1849 C Street NW
Washington, D.C.  20240

      Defendants.

**<u>COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF</u>**

Case No.:

## INTRODUCTION

1.      This action stems from Federal Defendants' abrupt termination of a longstanding federal commitment to restore grizzly bears—a threatened species— to the North Cascades Ecosystem in Washington.  Specifically, Plaintiff challenges Defendants' July 10, 2020 decision to "discontinue" its "proposal to develop and implement a Grizzly Bear Restoration Plan for the North Cascades Ecosystem" and accompanying "terminat[ion]" of the preparation of an Environmental Impact Statement ("EIS") for the proposal, 85 Fed. Reg. 41,624 (July 10, 2020) (hereinafter, "Termination Notice").  In this action, Plaintiff challenges Defendants' decision to abandon ongoing recovery planning efforts for North Cascades grizzlies and the termination of the accompanying process under the National Environmental Policy Act ("NEPA"), 85 Fed. Reg. 41,625 (July 10, 2020), in violation of NEPA, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.      As described by the U.S. Fish and Wildlife Service ("FWS") and the National Park Service ("NPS"), grizzly bears in the North Cascades Ecosystem are "the most at-risk grizzly bear population in the United States today."  Identified by FWS as one of six recovery zones necessary to achieve grizzly bear recovery, the North Cascades Ecosystem in Washington is home to less than ten grizzly bears.  There have been only four confirmed detections of grizzly bears in the North Cascades in the past ten years, all of which occurred in British Columbia. Scientists believe that the population may actually comprise just two individuals.

3.      Recognizing that grizzly bears are at risk of local extinction in the North Cascades Recovery Zone, and in accordance with the 1993 Grizzly Bear Recovery Plan and a 1997 Recovery Plan Supplement, in February 2015 FWS and NPS initiated a process under NEPA to analyze restoration of grizzly bears to the North Cascades.  The agencies collected public

comments during an initial scoping period and again following the release of a Draft

Environmental Impact Statement.  U.S. Department of the Interior, Draft Grizzly Bear

Restoration Plan/Environmental Impact Statement, North Cascades Ecosystem (Jan. 2017)

("DEIS").  As noted in the DEIS, the scientific consensus was that grizzly bears in the North

Cascades would have difficulty recovering on their own and human intervention would be

necessary to achieve reproduction and eventual recovery.

4.      In the DEIS, the agencies proposed three action alternatives, all of which had an

end goal of restoring a self-sustaining population of at least 200 bears through the capture and

release of grizzly bears into the North Cascades Recovery Zone.  The agencies stated that if they

took no action, the grizzly bear population in the North Cascades would not recover.

5.      Despite the agencies' acknowledgment that human intervention is necessary to

save this nearly extirpated grizzly bear population, on July 10, 2020, FWS and NPS issued a

notice abruptly announcing that the NEPA process had been terminated and that they are no

longer proposing to take action to augment the grizzly bear population in the North Cascades

Recovery Zone.  The Termination Notice provided no rationale for the agencies' about-face on

the need to augment this grizzly bear population to facilitate recovery.

6.      FWS's and NPS' abandonment of augmentation of the North Cascades grizzlies

and the termination of the accompanying NEPA process violates NEPA, the ESA, and the APA.

The termination violates NEPA by failing to follow procedural requirements following the

initiation of a NEPA process, including issuing a record of decision to explain the agencies'

decision.  40 C.F.R. § 1505.2. (stating that when an action agency makes a decision on the

proposal, it "shall" prepare a public record of decision stating the decision made and explaining

other considerations required by the regulations).

3

7.     The agencies' action also violate the ESA in several respects.  First, NPS is violating the ESA's mandatory duties requiring federal agencies to conserve listed species.  *See* 16 U.S.C. §§ 1531(c)(1) (providing "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter"), 1536(a)(1) (stating federal agencies "shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species").

8.     Additionally, the agencies are failing to implement the Grizzly Bear Recovery Plan, which calls for carrying out a NEPA process to evaluate alternatives to recover grizzly bears in the North Cascades, as required by ESA Section 4(f).  *See id.* § 1533(f)(1) ("The Secretary shall develop *and implement* [recovery] plans . . . for the conservation and survival of endangered and threatened species . . . unless he finds that such a plan will not promote the conservation of the species") (emphasis added).  By terminating the NEPA process called for in the Grizzly Bear Recovery Plan, FWS is failing to implement the plan.  FWS's discontinuance of its proposal to develop and implement a plan for restoring grizzly bears to the North Cascades Ecosystem and its termination of the NEPA process for considering alternatives for restoration also constitutes a significant de facto amendment to the Grizzly Bear Recovery Plan without following the notice and comment process mandated by Section 4(f) required for such an amendment.  *See id.* § 1533(f)(4).

9.     Finally, the agencies' termination of the bear augmentation plan is an agency action requiring consultation under Section 7(a)(2) of the ESA.  *See id.* § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that

4

any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species").  In view of the agencies' prior findings that restoring grizzly bears in the North Cascades Ecosystem is essential to the survival and recovery of the species, abandoning this process entirely is likely to jeopardize the continued existence of the species, and the agencies must complete Section 7 consultation to determine the impact of its termination action on the grizzly bear's survival and recovery.

10.     The agencies' termination of the NEPA process also violates the APA.  The longstanding position of FWS and NPS is that human intervention and augmentation is necessary to save the North Cascades grizzly bear from extirpation and they therefore initiated a process to prevent extirpation and put these grizzly bears on the road to recovery.  The agencies' decision to suddenly terminate the process is a stark reversal of a previously held agency position which must be backed by a "reasoned analysis."  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 57 (1983).  In the termination decision, the agencies not only failed to supply a "reasoned" analysis, but in fact failed to provide any analysis or reason at all.

11.     For these reasons, Plaintiff hereby asks the Court to declare that Defendants violated federal law and issue appropriate declaratory and injunctive relief to redress the injuries caused by these violations.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); *id.* §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §§ 1540(c), (g)(1)(c) (action arising under the ESA and citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act).

13.     Venue in this Court is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because this civil action is brought against agencies of the United States and officers and employees of the United States acting in their official capacities under the color of legal authority, a substantial part of the events giving rise to the claim occurred in the District of Columbia, and no real property is involved in this action.  Plaintiff Center for Biological Diversity also maintains an office in this judicial district.

14.     Plaintiff provided Defendants with 60 days' written notice of Plaintiff's intent to sue on July 15, 2020, as required by 16 U.S.C. § 1540(g)(2)(C).

### PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices in Washington, D.C., Arizona, California, Colorado, Florida, Hawai'i, Idaho, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Washington, and Mexico. The Center has more than 81,000 active members, including members within the grizzly bear's current and historical range.  The Center and its members have a long-standing interest in conserving native species in the American West and have routinely advocated for the conservation and protection of native species, including grizzly bears in the North Cascades.

16.     Plaintiff, both organizationally and on behalf of its members, has deep and long-standing interests in the preservation and recovery of imperiled species, including grizzly bears in the North Cascades Ecosystem.  To further these goals, Plaintiff has participated in various

6

agency proceedings and public comment opportunities to protect and recover grizzly bears,
including the NEPA process to augment the North Cascades grizzly bear population.

17.     Plaintiff has members who live near and regularly visit areas in and around the
North Cascades, most often for various recreational pursuits, including wildlife watching and
attempting to see and photograph grizzly bears in their natural habitat.  Plaintiff's members have
professional, spiritual, aesthetic, and recreational interests in recovering grizzly bears in the
North Cascades; these interests are being and will be negatively impacted by the termination of
the grizzly bear augmentation plan and the NEPA process aimed at recovery.  Plaintiff's
members have visited and plan to continue travelling and recreating in the North Cascades on a
regular basis, and they will maintain an interest in conserving and recovering grizzly bears in the
North Cascades in the future.

18.     For example, Sean Smith of Covington, Washington is a former National Park
Ranger at North Cascades National Park and holds a Master of Science in Natural Resource
Management from Central Washington University.  As a ranger for the North Cascades,
Yellowstone, and Glacier National Park, Mr. Smith participated in bear management activities
such as visitor education and use of non-lethal bear deterrence measures.  Although he has never
been fortunate enough to see a grizzly bear in the North Cascades, Mr. Smith states that he
would like to see grizzly bears in the North Cascades and has traveled to numerous places across
the West with the main goal of observing wildlife such as grizzly bears, including Glacier
National Park, Yellowstone National Park, and Grand Teton National Park.  He has seen several
dozen grizzly bears during his travels, both while on foot and from his vehicle.  Mr. Smith
explains that the failure to recover grizzly bears in the North Cascades would significantly

impact his ecological work to protect the environment for current and future generations and would diminish his opportunity to observe grizzly bears in the North Cascades.

19.     Plaintiff's interests in conserving and recovering grizzly bears are directly harmed by Defendants' termination decision.  Specifically, Plaintiff's professional, spiritual, aesthetic, and recreational interests have been and will continue to be greatly diminished because grizzlies are unlikely to recover in the North Cascades without human intervention.  As such, the termination decision decreases Plaintiff's opportunities to see and otherwise enjoy grizzly bears there.

20.     Plaintiff also has an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including NEPA and the ESA.  Plaintiff is injured by Defendants' termination of the process necessary to conserve and recover grizzly bears in the North Cascades, as well as Defendants' failure to carry out programs to conserve the North Cascades grizzly population, failure to implement the Grizzly Bear Recovery Plan or properly revise it, and failure to consult as to the impacts of their actions on the North Cascades grizzly bear population.

21.     For these reasons, Defendants' action has harmed and will continue to harm Plaintiff's interests.  The injuries described above are actual, concrete injuries presently suffered by Plaintiff and its members and they will continue to occur unless this Court grants relief.  These injuries are directly caused by Defendants' actions and inactions, and the relief sought herein would redress those injuries.  Plaintiff has no other adequate remedy at law.

22.     Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior.  In this role, Secretary Bernhardt has supervisory responsibility over the United States Fish and Wildlife Service and National Park Service.  Secretary Bernhardt also

made the decision challenged here to terminate the NEPA process.  Secretary Bernhardt is sued in his official capacity.

23.     Defendant AURELIA SKIPWITH is the Director of the United States Fish and Wildlife Service and is charged with ensuring agency decisions comply with law.  Director Skipwith is sued in her official capacity.

24.     Defendant MARAGERET EVERSON is Director for the National Park Service and is charged with ensuring agency decisions comply with law.  Deputy Director Everson is sued in her official capacity.

25.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife, such as grizzly bears, and ensuring that agency decisions comply with the ESA and other laws.

26.     Defendant NATIONAL PARK SERVICE is a federal agency within the Department of Interior.  The National Park Service is responsible for managing the lands and resources within the North Cascades National Park in accordance with federal laws and regulations, including NEPA, the ESA and the APA.

## STATUTORY BACKGROUND

### I.  The Endangered Species Act

27.     The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The ESA provides a means to conserve the ecosystems upon which endangered and threatened species depend and a program to conserve listed species.  16 U.S.C. § 1531(b).

28.     To receive the full protections under the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA Section 4.  *See id.* § 1533.  An "endangered species" is "any species which is danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

29.     Section 2(c)(1) of the ESA provides that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  *Id.* § 1531(c)(1).  Similarly, Section 7(a)(1) provides that all federal agencies "shall . . . utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed."  *Id.* § 1536(a)(1).  The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3), *i.e.* to bring about the recovery of species listed as endangered or threatened.  "Conservation" specifically includes "live trapping" and "transplantation."  *Id.*

30.     To further carry out the ESA's purpose that species be "conserved," Section 4(f) of the ESA requires FWS to "develop and implement" recovery plans for the "conservation and survival" of listed species unless the agency makes a finding that "such a plan will not promote the conservation of the species."  *Id.* § 1533(f)(1).  FWS, "in developing and implementing recovery plans, shall, to the maximum extent practicable" incorporate "such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species," as well as "objective, measurable criteria which, when met, would result

in a determination, in accordance with the provisions of this section, that the species be removed

from the list." *Id.* § 1533(f)(1)(B)(i), (ii).  The paramount purpose of a recovery plan, therefore,

is to provide for the recovery of the species.  Section 4(f) further provides that "prior to final

approval of a new or revised recovery plan," FWS shall "provide public notice and an

opportunity for public review and comment on such plan." *Id.* § 1533(f)(4).

31.     Section 7(a)(2) of the ESA requires each federal agency, in consultation with a

federal wildlife agency (FWS for the grizzly bear), to insure that any proposed action is not

likely to jeopardize the continued existence of a listed species, or result in the destruction or

adverse modification of critical habitat.  *Id.* § 1536(a)(2).  To "jeopardize the continued existence

of" under the ESA means "to engage in an action that reasonably would be expected, directly or

indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species."  50

C.F.R. § 402.02.

32.     To carry out the consultation mandates, the action agency must first ask FWS

whether any listed or proposed species may be present in the area of the agency action.  16

U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  If listed or proposed species may be present, the action

agency must prepare a "biological assessment" to determine whether the listed species may be

affected by the proposed action.  16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12.

33.     If an agency determines that its action "may affect" but is "not likely to adversely

affect" a listed species or its critical habitat, the regulations permit "informal consultation,"

during which FWS must concur in writing with the agency's determination.  50 C.F.R.

§§ 402.14(a), (b).  If the agency determines that the action is "likely to adversely affect" a listed

species or critical habitat, or if FWS does not concur with the agency's "not likely to adversely

affect" determination, the agency must engage in "formal consultation," as outlined in 50 C.F.R. § 402.14.  *Id.* §§ 402.02, 402.14(a).

34.     After FWS evaluates the current status of the listed species and the proposed action's impacts on the species using the best scientific and commercial data available, FWS reaches a "biological opinion" as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(d), (g)(4).  If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).

35.     Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency.

## II.  The National Environmental Policy Act

36.     NEPA, 42 U.S.C. § 4321 *et seq.*, is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  The Council on Environmental Quality ("CEQ") has adopted regulations governing the implementation of NEPA.

37.     The action challenged in this case is governed by the CEQ's 1978 regulations as amended and in force when NPS and FWS initiated and terminated the NEPA process to recover grizzly bears in the North Cascades.  Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules apply only "to any NEPA process begun after September 14, 2020," or where the agency has chosen to "apply the regulations . . . to ongoing activities."  40 C.F.R. § 1506.13 (2020).

38.     Individual agencies have also promulgated regulations and guidance further interpreting their NEPA obligations.  *See* 50 C.F.R. § 530 (FWS and National Marine Fisheries Service NEPA regulations).

39.     NEPA is primarily a procedural statute, and its procedural provisions "establish a strict standard of compliance."  *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971).

40.     Under NEPA, federal agencies must prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). First, NEPA requires an early process, called scoping, in which the agency determines the scope of the issues to be addressed and the significant issues requiring detailed analysis.  40 C.F.R. § 1501.7.  If the agency identifies significant impacts through scoping, NEPA mandates that agencies prepare an EIS through a two-stage process, first preparing and soliciting public comment on a draft EIS that fully complies with NEPA's environmental analysis requirements. *See id.* §§ 1502.9(a), 1503.1(a)(4).  Agencies next prepare a final EIS that responds to the comments received by the agency regarding the draft EIS.  *Id.* §§ 1502.9(b), 1503.4.

41.     When preparing an EIS, the agency must present and analyze all reasonable alternatives, including the proposed action and a no action alternative.  *Id.* § 1502.14.  The EIS shall compare the environmental consequences of each alternative analyzed.  *Id.*  The agency also must fully analyze all direct, indirect and cumulative effects of each alternative explored. *Id.* § 1502.16.

42.     Once the final EIS is released and at the time of its decision, the agency "shall prepare a concise public record of decision."  *Id.* § 1505.2.  The record of decision must state the

decision of the agency, identify all alternatives considered, and state whether the agency has adopted all practicable means to avoid or minimize environmental harm.  *Id.*

43.     Until the agency issues a record of decision, the agency may not take any action concerning the proposal that would have an adverse effect on the environment or limit the choice of reasonable alternatives.  *Id.* §§ 1506.1(a)(1), (2).

## III.  The Administrative Procedure Act

44.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof."  5 U.S.C. § 702.

45.     Upon review of agency action, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  *Id.* § 706(2)(A).  An action is arbitrary and capricious "if the agency has relied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  When an agency reverses course, it must supply "a reasoned analysis for the change."  *Id.* at 42.  The burden is on the agency to explain its decision.  *Id.* at 57.

## FACTUAL BACKGROUND

## I.  Grizzly Bears in the North Cascades

46.     Grizzly bears once ranged throughout most of western North America, from the high Arctic to the Sierra Madre Occidental of Mexico, and from the coast of California across most of the Great Plains.  Scientists believe that prior to European settlement, approximately 50,000 grizzly bears occupied the western United States between Canada and Mexico.  With

European settlement of the American West and federal persecution aimed at eradication, grizzly bears were shot, trapped, and poisoned, reducing the population to just two percent of their historic range.

47.     Because of its precipitous decline, FWS listed the grizzly bear as a threatened species in the lower 48 states under the ESA in 1975.  Today scientists estimate there are less than 2,000 grizzly bears left in the lower 48 states, occupying five isolated populations.

48.     In accordance with the ESA, FWS first approved a grizzly bear recovery plan in 1982, which it revised in 1993, to "delineate reasonable actions that are believed to be required to recover and/or protect" the grizzly bear.  *See* U.S. Fish and Wildlife Service, Revised Grizzly Bear Recovery Plan (1993) (hereinafter, "1993 Recovery Plan").

49.     In the 1993 Recovery Plan, FWS initially identified four recovery zones (Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirks) and three evaluation areas (Bitterroot, North Cascades, and San Juan Mountains) for potential recovery.

50.     In 1997, FWS prepared a Supplement to the 1993 Recovery Plan providing a recovery chapter for the North Cascades Ecosystem and officially declaring the delineated area as a Recovery Zone.  *See* U.S. Fish and Wildlife Service, Grizzly Bear Recovery Plan, Supplement:  North Cascades Ecosystem Recovery Plan Chapter (1997) (hereinafter, "1997 Recovery Plan Supplement").

51.     The North Cascades Grizzly Bear Recovery Zone is one of the largest contiguous blocks of Federal land remaining in the lower 48 states, comprising approximately 9,565 square miles in north-central Washington.  It includes all of the North Cascades National Park and most of the Mount Baker-Snoqualmie, Wenatchee, and Okanogan National Forests.  Approximately 40 percent of the Recovery Zone is within wilderness of the North Cascades National Park and

15

about 72 percent has no motorized access.  For these reasons, FWS has recognized that the North

Cascades Recovery Zone provides ample habitat to maintain and recover a grizzly bear

population.

52.     The 1997 Recovery Plan Supplement provides numerous goals and sub-goals for

the recovery of grizzly bears in the North Cascades, and outlines "the recovery contribution that

should be made within the US portion of the [North Cascades Ecosystem] in compliance with the

Endangered Species Act."  *Id.* at 4.  One of the "priority recovery actions" calls on FWS to

conduct a process under NEPA "to evaluate a range of alternatives to recover this population

including the augmentation of the existing small population by placement of a small number of

bears into the ecosystem and/or other recovery alternatives."  *Id.*

53.     To reach recovery, FWS determined that the grizzly bear population must be

"large enough to offset some level of human-induced mortality and be self-sustaining despite

foreseeable influences of demographic and environmental variation," and "reproducing bears

[must be] distributed throughout the recovery area," with a population potentially consisting of

between 200-400 bears in the U.S. portion of the North Cascades Ecosystem.  *Id.* at 3.  Thus,

according to FWS, "[e]ventual delisting of the grizzly bear should be determined by the

achievement of a viable, well distributed, reproducing population."  *Id.* at 5

54.     Although historical records indicate that grizzly bears once occupied lands

throughout the North Cascades Recovery Zone, government agents and private hunters killed

thousands of grizzly bears in the region in the mid-1800s for their fur and with an overarching

goal of extirpating them from the region.

55.     Today, grizzly bears have been nearly extirpated from the North Cascades

Recovery Zone.  There have been only four confirmed detections of grizzly bears in the North

Cascades in the past ten years, all of which occurred adjacent to the Recovery Zone in British Columbia.

56.     Due to the vulnerable state of the North Cascades grizzly bear population, FWS has received and reviewed five petitions since 1990 requesting a change in the listing status for the North Cascades grizzly bear population and determined that grizzly bears in the North Cascades warrant a change from threatened to endangered status.  However, FWS has continually found that the uplisting to endangered status under the ESA, while necessary, is precluded by higher priority listings.

57.     FWS and NPS have consistently acknowledged that given the current state of the grizzly bear population in the North Cascades, this population is unlikely to recover without augmenting the population with bears from other areas.

58.     FWS has also consistently recognized that recovery of grizzly bears in the North Cascades Ecosystem is necessary for recovery of the species in the lower 48 states.  For example, in the scoping notice initiating the NEPA process terminated by Defendants, the agencies explained that action to restore grizzly bears to the North Cascades Ecosystem is "needed at this time to . . . [s]upport the eventual removal of the grizzly bear from the Federal List of Endangered and Threatened Wildlife."  U.S. Department of the Interior, North Cascades Ecosystem Grizzly Bear Restoration/Environmental Impact Statement, Washington, Notice of Intent, 80 Fed. Reg. 8894, 8895 (Feb. 19, 2015) (hereinafter, "Scoping Notice").  The agencies later echoed this finding in releasing the DEIS.  U.S. Fish and Wildlife Service and National Park Service, Draft Environmental Impact Statement/Grizzly Bear Restoration Plan, North Cascades Ecosystem, Washington, Notice of Availability for Public Comment, 82 Fed. Reg. 4416, 4416 (Jan. 13, 2017).  FWS has repeated this conclusion in other venues as well.  *See*

Declaration of Dr. Jennifer Fortin-Noreus at ¶¶ 4-5, *Ctr. for Biological Diversity v. Bernhardt*, No. 9:19-cv-00109-DLC (D. Mont. July 6, 2020), ECF No. 66-1 (declaration of FWS wildlife biologist in the Grizzly Bear Recovery Program explaining that recovery of grizzly bears in the six identified recovery zones, including the North Cascades, will meet FWS's obligation under the ESA to recover grizzly bears to the point that protection under the ESA is no longer necessary).

## II.  The NEPA Process

59.    In accordance with the 1997 Recovery Plan Supplement and with the recognition that grizzly bears in the North Cascades are unlikely to recover on their own, in February 2015 FWS and NPS initiated a process under NEPA "to determine how to restore the grizzly bear (*Ursos arctos horribilis*) to the North Cascades ecosystem (NCE), a portion of its historical range."  *See* Scoping Notice, 80 Fed. Reg. at 8894.  In initiating the NEPA process, NPS stated that "[t]he Grizzly Bear Recovery Plan calls on us to fully consider restoration of the grizzly bear in the North Cascades, and this process will ensure we solicit the public for their input before putting any plan into action."  Press Release, U.S. Dep't of Interior, N. Cascades Nat'l Park Serv. Complex and U.S. Fish and Wildlife Serv., Public Invited to Open Houses on Options for Grizzly Bear Restoration in North Cascades Ecosystem, (Feb. 13, 2015), at 2, found at https://www.nps.gov/noca/learn/news/public-invited-to-open-houses-on-options-for-grizzly-bear-restoration-in-north-cascades-ecosystem.htm (last visited Dec. 15, 2020).

60.    In the Scoping Notice, the agencies stated that "[g]iven the low number of grizzly bears, very slow reproductive rate, and other recovery constraints, grizzly bears in the NCE are the most at-risk grizzly bear population in the United States today" and are at risk of extirpation. 80 Fed. Reg. at 8894-95.  The agencies acknowledged that "[n]atural recovery in the [North Cascades Ecosystem] is challenged by the absence of verified reproduction, as well as isolation

from any contiguous population in British Columbia, Canada, and the United States." *Id.* at

8895. The agencies found that action was necessary to avoid local extinction, contribute to

biodiversity of the ecosystem, enhance the probability of long-term survival and conservation of

the grizzly bear, contribute to overall grizzly bear recovery, and support the eventual delisting of

grizzly bears. *Id.* at 8895.

61.   Plaintiff provided timely comments during this scoping process supporting grizzly

bear recovery in the North Cascades Ecosystem. Others also submitted comments supporting

grizzly bear augmentation and restoration to recover grizzly bears in the North Cascades,

including at least fifteen conservation organizations, six non-governmental organizations, four

tribal nations, and countless individuals. *See* North Cascades Ecosystem Grizzly Bear

Restoration Plan/Environmental Impact Statement, Public Scoping Comment Analysis Report

(June 2015), at App. C, found at

https://parkplanning.nps.gov/document.cfm?parkID=327&projectID=44144&documentID=6650

6 (last visited Sept. 1, 2020).

62.   In January 2017, FWS and NPS released the "Draft Grizzly Bear Restoration

Plan/Environmental Impact Statement" for the North Cascades Ecosystem for public review and

comment. *See* 82 Fed. Reg. 4336 (Jan. 13, 2017); 82 Fed. Reg. 4416 (Jan. 13, 2017). According

to the agencies, the purpose of the Plan/DEIS was to evaluate alternatives for restoring grizzly

bears to the North Cascades Ecosystem. 82 Fed. Reg. at 4416.

63.   The Plan/DEIS repeated the purpose and objectives from the 1997 Recovery Plan

Supplement, including the need to support the recovery of the grizzly bear. DEIS at 3.

64.   In the Plan/DEIS, "[a]ll of the action alternatives [under consideration] would

seek to restore a self-sustaining population of at least 200 bears through the capture and release

of grizzly bears into the NCE." DEIS at iii. The agencies explained in the Plan/DEIS that

"[b]iological consensus is that grizzly bears in the NCE would have difficulty recovering on their

own and need some form of human intervention to achieve reproduction and eventual recovery,"

and that the no-action alternative would not likely achieve reproduction and recovery goals. *Id.*

at v.

65.     Plaintiff submitted timely comments on the DEIS supporting the overall strategy

by the agencies to augment the population of grizzly bears in the North Cascades Ecosystem to

support the long-term survival of grizzly bears in this region and to aid in the overall recovery of

grizzly bears in the western United States.

66.     In December 2017, then-Secretary of Interior Ryan Zinke temporarily halted the

NEPA process, asking NPS to stop work on its environmental impact statement. *See* Press

Release, Rob Chaney, The Missoulian, North Cascades grizzly bear recovery work halted by

Interior Department (Dec. 16, 2017), found at https://missoulian.com/news/local/north-cascades-

grizzly-bear-recovery-work-halted-by-interior-department/article_54f56987-68f7-5227-a7a5-

ec14d7a6d44d.html (last visited Dec. 15, 2020).

67.     Following widespread public outcry, in March 2018 then-Secretary Zinke traveled

to Sedro-Woolley, Washington where he recanted his order to halt work on the NEPA process to

recover grizzly bears in the North Cascades and instead announced support of the grizzly bear

restoration efforts. Press Release, U.S. Dep't of the Interior, Secretary Zinke Supports Grizzly

Bear Restoration in North Cascades Ecosystem (Mar. 23, 2018), found at

https://www.doi.gov/pressreleases/secretary-zinke-supports-grizzly-bear-restoration-north-

cascades-ecosystem (last visited Dec. 15, 2020). He discussed the "cultural and spiritual

importance of grizzly bears in tribal communities, the contributions grizzly bears make to the

biodiversity of the ecosystem, and the ecological devastation that the permanent loss of grizzly bears would cause if nothing is done." *Id.* He continued, stating: "We are managing the land and the wildlife according to the best science and best practices. The loss of the grizzly bear in the North Cascades would disturb the ecosystem and rob the region of an icon." *Id.* Thus, he announced, "[w]e are moving forward with plans to restore the bear to the North Cascades, continuing our commitment to conservation and living up to our responsibility as the premier stewards of our public land." *Id.* The agency further announced that release of a final EIS was tentatively scheduled for late summer of 2018. *Id.*

68. After two years of inaction, in July 2019, the agencies reopened the comment period on the DEIS. *See* 84 Fed. Reg. 36,099 (July 26, 2019). The agencies did not provide an explanation as to why they were reopening the comment period.

69. Approximately one year later, on July 10, 2020, FWS and NPS abruptly announced that they had decided to "discontinue the proposal to develop and implement a Grizzly Bear Restoration Plan for the North Cascades Ecosystem" and that "the EIS process has been terminated." 85 Fed. Reg. 41,624 (July 10, 2020).

70. The agencies provided no rationale whatsoever in the Federal Register's Termination Notice explaining the total reversal in course and their decision to discontinue the NEPA process that began more than five years earlier, and released no record of decision explaining the agencies' action.

71. The agencies also did not propose any alternative actions that they would take to conserve or recover grizzly bears in the North Cascades Recovery Zone, even after they had acknowledged on several occasions, including throughout the recent NEPA process, that human intervention would be necessary to recover grizzly bears there.

## FIRST CAUSE OF ACTION

### FWS's and NPS's Violation of the APA
### (Failure to Provide Reasoned Analysis for Change in Course)

72.     Plaintiff hereby incorporates all preceding paragraphs.

73.     In 2015, in accordance with the 1997 Recovery Plan Supplement, FWS and NPS embarked on a process aimed at conserving grizzly bears in the North Cascades through development of a Grizzly Bear Restoration Plan for the North Cascades Ecosystem and an accompanying NEPA process.  In doing so, the agencies repeatedly acknowledged that human intervention would be necessary to recover this nearly extirpated grizzly bear population, and that a Restoration Plan and NEPA process were essential to recover the grizzly bear in the North Cascades which, in turn, is critical to the bear's overall survival and recovery.

74.     Throughout the plan development and NEPA evaluation process, the agencies asserted that taking no action would not recover grizzlies in the North Cascades and that augmentation would be necessary to prevent local extirpation.

75.     Without explanation, on July 10, 2020 the agencies announced their decision to "discontinue the proposal" to "develop and implement a Grizzly Bear Restoration Plan for the North Cascades Ecosystem" and terminated the NEPA process.  The Termination Notice embodies a decision that, if allowed to stand, would foreclose recovery of grizzly bears in the North Cascades.

76.     The Termination Notice reflects a complete reversal in the agencies' course of action, changing a multi-year-long process that the agencies had asserted was necessary to recover grizzly bears in the North Cascades.

77.     When an agency reverses course as FWS and NPS have done here, it must supply "a reasoned analysis for the change," and the burden is on the agency to explain its decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42, 57.

78.     Because FWS and NPS failed to provide a reasoned analysis for its changed course, they have violated the APA and the action terminating the restoration planning and NEPA process is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## SECOND CAUSE OF ACTION

### FWS's and NPS's Violation of NEPA and the APA
### (Failure to Issue a Record of Decision)

79.     Plaintiff hereby incorporates all preceding paragraphs.

80.     NEPA require agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Because Defendants determined that augmenting and recovering the North Cascades grizzly bear population may have significant environmental effects, they prepared a draft EIS for public comment and review.

81.     As required by NEPA's implementing regulations, the DEIS analyzed various alternatives to augment the grizzly bear population and a no action alternative.  *See* 40 C.F.R. § 1502.14 (requiring agencies to analyze all reasonable alternatives and a no action alternative in an EIS).

82.     Following the collection and review of public comment, agencies are required to prepare a final EIS that responds to the comments received on the draft EIS.  *Id.* §§ 1502.9(b), 1503.4.  When an action agency makes a decision on the proposal, it "shall" prepare a public

record of decision stating the decision made and explaining other considerations required by the regulations.  *Id.* § 1505.2.

83.     After issuing the draft EIS and collecting two rounds of public comments, Defendants decided that they would not take action to augment and recover the North Cascades grizzly bear population.

84.     In deciding to take no further action to augment and recover the North Cascades grizzly bear population, Defendants chose the no action alternative.  However, Defendants failed to issue a final EIS and record of decision as NEPA requires.  Even where an action agency chooses the no action alterative, NEPAs' implanting regulations require that the agency issue a final EIS and a record of decision.  Defendants violated NEPA by failing to prepare and issue these required documents.

85.     Defendants' abrupt "termination" of the NEPA process without the issuance of a final EIS or record of decision constitutes agency action "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION

#### NPS's Violation of the ESA's Conservation Mandate
#### (Failure to Conserve North Cascades Grizzly Bears)

86.     Plaintiff hereby incorporates all preceding paragraphs.

87.     Section 2(c)(1) and Section 7(a)(1) of the ESA provide an "affirmative duty" for federal agencies to conserve listed species.  Under Section 2(c)(1) of the ESA, "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  *Id.* § 1531(c)(1). Similarly, Section 7(a)(1) provides that all federal agencies "shall, in consultation with and with the assistance of [FWS], utilize their authorities in furtherance of the purposes of this chapter by

carrying out programs for the conservation of endangered species and threatened species listed." *Id.* § 1536(a)(1).

88.     The ESA broadly defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," including "live trapping" and "transplantation." *Id.* § 1532(3).

89.     In the Scoping Notice and the DEIS, both FWS and NPS concluded that human intervention through augmentation was necessary to recover grizzly bears in the North Cascades Recovery Zone.

90.     In the DEIS, the agencies explained that the "[b]iological consensus is that grizzly bears in the NCE would have difficulty recovering and their own and need some form of human intervention to achieve reproduction and eventual recovery" and that action is "necessary" to avoid the permanent loss of grizzly bears in the North Cascades.  DEIS at ii, v.  Without human intervention, the population is at risk of local extinction.  80 Fed. Reg. at 8894-95.

91.     "Conservation" of the grizzly bear cannot be achieved unless the agencies proceed with augmentation.  Recovery in the North Cascades through human intervention is a prerequisite to getting the grizzly bear "to the point at which the measures provided pursuant to this [Act] are no longer necessary."  16 U.S.C. § 1532(3) (definition of "conservation"); *see id.* § 1532(20) (definition of "threatened species").

92.     Because the agencies have acknowledged that augmentation of the North Cascades grizzly bear population is necessary to recover the species, and that without human intervention the population is at risk of local extinction, NPS's unexplained termination of the augmentation program violates NPS's obligation under ESA Section 2(c)(1) and Section 7(a)(1)

to provide for the conservation of endangered and threatened species.  *Id.* §§ 1531(c)(1),

1536(a)(1).

93.     NPS's violation of its obligation to consult with FWS for the purpose of carrying

out a program for the recovery of grizzly bears on NPS lands is also arbitrary, capricious, and

abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. §

706(2)(A).

**FOURTH CAUSE OF ACTION**

**FWS's Violation of the ESA's Recovery Planning Requirements**
**(FWS's Failure to Implement the Grizzly Bear Recovery Plan and/or to Revise the**
**Recovery Plan Through Notice and Comment Proceedings)**

94.     Plaintiff hereby incorporates all preceding paragraphs.

95.     Under Section 4(f) of the ESA, FWS has a non-discretionary duty to "develop and

implement" recovery plans for the "conservation and survival" of listed species.  16 U.S.C. §

1533(f)(1).

96.     FWS committed in the 1997 Recovery Plan Supplement to consider a range of

alternatives for recovery of this population through a NEPA process, "including the

augmentation of the existing small population by placement of a small number of bears into the

ecosystem and/or other recovery alternatives."  1997 Recovery Plan Supplement at 3-4.  FWS

identified pursuit of the NEPA process as one of five priority recovery actions to take place

within five years.  *Id.* at 4-5.

97.     FWS, along with NPS, finally initiated the restoration planning and

accompanying NEPA process approximately 18 years after publication of the 1997 Supplement.

In announcing the availability of the Plan/DEIS for public comment, the agencies declared

unequivocally that affirmative "[a]ction is need at this time" to "[a]void the permanent loss of

grizzly bears in the [North Cascades Ecosystem]" and to "[s]upport the recovery of the grizzly

bear to the point where it can be removed from the List of Endangered and Threatened Species."

82 Fed. Reg. at 4416.

98.     Because FWS and NPS terminated the restoration planning and NEPA process

found to be necessary to recover grizzly bears in the North Cascades and identified as a priority

action in the 1997 Supplement to the Recovery Plan, FWS has failed to "develop and

implement" a plan for the "conservation and survival" of the grizzly bear, in violation of Section

4(f) of the ESA.  16 U.S.C. § 1533(f)(1).

99.     The abandonment of recovery planning and development of an EIS for restoration

of grizzly bears in the North Cascades also constitutes a major de facto revision of the Recovery

Plan for the grizzly bear that was adopted in the absence of any public notice and comment, in

violation of Section 4(f)(4) of the ESA.  *Id.* § 1533(f)(4).

## FIFTH CAUSE OF ACTION

### FWS's and NPS's Violation of the ESA's Consultation Requirements
### (FWS's and NPS's Failure to Consult)

100.     Section 7(a)(2) requires agencies to consult on the impacts of any agency action

to ensure that any such action is not likely to jeopardize the continued existence of a listed

species.  16 U.S.C. § 1536(a)(2).

101.     The FWS's and NPS's decision to abandon the augmentation plan for grizzly

bears in the North Cascades, as embodied in the decision to terminate the ongoing NEPA process

to facilitate recovery of grizzly bears in the North Cascades, is an affirmative agency action that

requires consultation so that the agencies can ensure their action will not jeopardize the

continued existence of grizzly bears in the North Cascades Ecosystem.

102.     Despite this requirement in the ESA, neither agency initiated or completed consultation on the decision to abandon recovery planning and terminate the NEPA process.

103.     The agencies have admitted that without human intervention, recovery is unlikely and local extirpation of grizzly bears in the North Cascades is probable.  Thus, it follows that terminating the process necessary to augment this disappearing population may indeed jeopardize the continued existence of grizzly bears there.

104.     FWS and NPS have violated Section 7(a)(2) of the ESA and its implementing regulations by failing to initiate consultation and by failing to ensure through consultation that their decision to terminate the accompanying NEPA process does not jeopardize the continued existence of the species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Declare that FWS and NPS violated the APA in connection with the decision to abandon the grizzly bear augmentation plan and terminate the accompanying NEPA process by reversing course without supplying a reasoned analysis;

2.     Declare that FWS and NPS violated NEPA and the APA by prematurely terminating the NEPA process and failing to issue a record of decision;

3.     Declare that NPS violated Section 2(c) and Section 7(a)(1) the ESA in connection with the decision to abandon the grizzly bear augmentation plan and terminate the accompanying NEPA process by failing to provide for the conservation of grizzly bears in the North Cascades;

4.     Declare that FWS violated Section 4(f) of the ESA by failing to develop and implement a recovery plan for the conservation and survival of grizzly bears in the North

Cascades, and by effectively revising the recovery plan without soliciting public comment on the revision;

5.      Declare that FWS and NPS violated Section 7(a)(2) of the ESA by failing to ensure against jeopardy through consultation on the impacts of the decision to abandon recovery planning and terminate the accompanying NEPA process;

6.      Set aside Defendants' decision to jettison the grizzly bear augmentation plan for the North Cascades grizzly bear population based on these legal violations and order Defendants to proceed with the abandoned augmentation plan and accompanying NEPA process;

7.      Award Plaintiff its reasonable attorneys' fees, costs and expenses associated with this litigation under the ESA and the Equal Access to Justice Act; and

8.      Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein.


Dated:  December 16, 2020                    Respectfully submitted,

                                             /s/ Andrea Zaccardi
                                             Andrea Zaccardi
                                             (Idaho Bar No. 8818)*
                                             Center for Biological Diversity
                                             P.O. Box 469
                                             Victor, ID  83455
                                             Tel.: (303) 854-7748
                                             Email: azaccardi@biologicaldiversity.org

                                             /s/ William J. Snape, III
                                             William J. Snape, III
                                             (D.C. Bar No. 455266)
                                             Center for Biological Diversity
                                             1411 K Street, NW, Suite 1300
                                             Washington, D.C.  20005
                                             Tel.: (202) 536-9351
                                             Emails:  bsnape@bioogicaldiversity.org,
                                             wsnape@wcl.american.edu

*Attorneys for Plaintiff*

*Seeking admission *pro hac vice*